Judgment rendered May 20, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,769-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

DONNA ANGLIN AND ROBERT                    Plaintiffs-Appellants
B. ANGLIN

versus

CHRISTUS SCHUMPERT                         Defendants-Appellees
HIGHLAND HEALTH SYSTEM,
ET AL.

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 569,316

Honorable Michael A. Pitman, Judge

* * * * *

WALTER FLANDERS CLAWSON              Counsel for Appellees,
                                     Louisiana Patient's
                                     Compensation Fund and
                                     the Louisiana
                                     Patient's Compensation
                                     Fund Oversight Board

LAW OFFICE OF SUSAN E. HAMM          Counsel for Appellants
By:  Susan Elizabeth Hamm

* * * * *

Before COX, ROBINSON, and MARCOTTE, JJ.

**ROBINSON, J.**

This medical malpractice case proceeded to a jury trial after the defendant doctor, Dr. Kevin Cline, settled the claim against him for $100,000. The jury found that Dr. Cline's breach of the standard of care did not cause injury over $100,000 to the plaintiffs that would not have otherwise occurred. The plaintiffs have appealed. For the following reasons, we affirm the judgment.

## FACTS

Donna Anglin suffered from urinary incontinence and a bladder prolapse into her vagina. She was examined by Dr. Tommy Mook of Regional Urology on August 14, 2009. Dr. Mook discussed an anterior repair and sling placement with her, and that his partner Dr. Cline would perform one of the procedures using mesh.

Dr. Cline met with Donna on August 19, 2009, to discuss the two procedures. For the prolapse, he recommended a Pinnacle anterior repair with Obtryx sling.

Donna had a long history of fibromyalgia, which had been diagnosed in 1996 by Dr. Larry Broadwell, who specialized in arthritis and rheumatology.

On August 28, 2009, Donna, who was 57 years old at the time, underwent surgery to repair the bladder prolapse and to correct her urinary incontinence. As to the bladder prolapse procedure, the operative report named it as a "Pinnacle anterior repair with sacrospinous suspension using mesh anterior repair and Obtryx sling."

Donna complained of severe pain in her left leg immediately after the surgery. Dr. Edward Anglin, an orthopedic surgeon who was related to Donna's husband, examined her in the hospital on August 31. He thought that she had left sciatica secondary to pressure phenomenon. He ordered a Celestone injection. Donna was discharged from the hospital on September 1.

Donna was seen at Regional Urology by Dr. Ernesto Spinazze on September 3, 2009. She complained of pain radiating down her left leg and thigh. He referred her to Dr. Ravish Patwardhan, a neurosurgeon, who saw Donna on September 9. Dr. Patwardhan wrote to Dr. Spinazze that an MRI of her lumbar spine showed no clear compressive lesion, and that he recommended an EMG study.

Dr. J. Eric Bicknell performed a nerve conduction study on September 9, 2009. His impressions were somewhat reduced left peroneal and tibial compound muscle action potential ("CMAP") amplitudes with prolonged left tibial H-reflex latency, which were suggestive of some degree of left sciatic neuropathy. Donna had normal bilateral femoral and right peroneal and tibial nerve conduction studies. Dr. Bicknell recommended a left lower extremity and left lumbosacral EMG study in at least two weeks to corroborate his impressions.

Dr. Cline saw Donna on September 14, 2009, for treatment of a vaginal discharge. She complained of severe posterior knee and calf pain following surgery that had radiated up into her buttock during the last week.

Donna saw Dr. Anglin on September 17, 2009, with complaints of severe left knee pain. His impression was left peroneal nerve neuralgia.

Dr. Patwardhan performed a CT scan of the abdomen and pelvis on September 17, 2009. No focal obstructing mass lesion was identified. An MRI of the lumbar spine was normal.

Dr. Randall Brewer treated Donna on September 22, 2009, for left lower extremity pain. Donna described the pain level as severe, or as a ten on a ten-point scale. Her pain occurred constantly and was worsening, and involved her entire leg. She reported that she had severe pain following surgery that started by her knee, the pain had spread to her calf, her toes were numb, and in the last week, it had moved into her thigh and hip. She described it as the worst pain that she had ever experienced. Dr. Brewer's impressions were neuralgia, sciatic nerve injury, and fibromyalgia. He administered a selective nerve root block at L4, L5, and S1.

On September 29, 2009, Dr. Bicknell performed an EMG and a second nerve conduction study. His impressions were a normal left lower extremity and lumbosacral paraspinal needle EMG exam, and reduced left common peroneal and tibial CMAP amplitudes that were likely secondary to edema in her leg.

On August 28, 2010, the Anglins filed a request for the formation of a Medical Review Panel ("MRP") for their medical malpractice claims against Dr. Cline, Christus Schumpert Highland Health System, the anesthesiologist, and two CRNAs. The MRP concluded that Dr. Cline failed to meet the applicable standard of care when he failed to obtain adequate informed consent. The MRP added that there was a material issue of fact as to whether that conduct was a factor in the resulting damages.

In its written reasons for its conclusion, the MRP stated that the exact etiology of Donna's sciatic neuropathy was never fully clarified and several possibilities existed: (1) unusual manifestation of her known fibromyalgia; (2) exacerbation of pre-existing lumbar-sacral spine disease; (3) prior traumatic or arthritic knee disease; or (4) a complication of the surgery, most likely the sacrospinous ligament suspension for correction of the vaginal prolapse. According to the MRP, the last possibility had been reported to be induced by traction of the suture on the sacrospinous ligament, with the tension being transmitted to the sciatic nerve and the pain usually resolving in two to three weeks.

Regarding the lack of informed consent, the MRP wrote that the complication experienced by Donna was a known risk. Adequate informed consent was not obtained because the forms did not include a specific reference to "sacrospinous suspension" or the use of the Pinnacle mesh kit.

The Pinnacle mesh kits were taken off the market because of reported complications. On February 29, 2012, Dr. Robert Marx surgically removed the mesh from Donna.

On July 16, 2012, the Anglins filed a lawsuit against Boston Scientific Corporation, the manufacturer of the Obtryx sling and the Pinnacle mesh kit. Boston Scientific settled the lawsuit.

On June 19, 2013, Donna and Robert filed a medical malpractice lawsuit against Christus Schumpert Highland Health System, Dr. Cline, the anesthesiologist, and the two CRNAs.

On September 10, 2013, the Anglins amended their petition to add Louisiana Mutual Medical Insurance Company ("LAMMICO") as a defendant.

On May 11, 2016, the Anglins filed a petition for authorization to settle its claims against Dr. Cline for $100,000 while seeking additional damages from the Louisiana Patient's Compensation Fund ("Fund"). On May 20, 2016, the court rendered judgment approving the settlement.

*Trial*

A jury trial was conducted over five days in July of 2024. The hospital, anesthesiologist, and the two CRNAs had been dismissed well before trial. The jury answered "No" to the question of if it found that Dr. Cline's breach of the standard of care caused injury over $100,000 to the Anglins that would not have otherwise occurred. A judgment in accordance with the verdict was rendered on July 31, 2024.

Dr. Tracey Wilson testified on behalf of the Anglins as an expert in the field of urology with the subspecialty of pelvic disorders. She explained that mesh was placed under the bladder to lift it up, while a sling was used to treat the incontinence. During Donna's surgery, the mesh was suspended from the sacrospinous ligament. Dr. Wilson believed that the traction for the sacrospinous suspension was too tight and it stretched the sciatic nerve.

Dr. Wilson stated that in her opinion, adequate informed consent was not obtained because Donna did not consent to the sacrospinous suspension or use of the Pinnacle mesh kit. She added that nothing on the consent form mentioned a potential nerve injury, which is a known complication from a sacrospinous fixation.

5

Retired Judge Frank Thaxton, the chairman of the MRP, testified about the MRP proceedings. He stated that the MRP did not address what damages resulted from the lack of informed consent because the MRP had a question concerning whether Donna would have had the surgery if she had been given proper informed consent.

Dr. Howard Katz testified as an expert in the field of physical medicine and rehabilitation. He examined Donna on August 13, 2020. She complained of low back pain, sciatic nerve pain, burning and stabbing pain from the waist down, unsteady legs, tremors, and depression. She also gave a history of fibromyalgia that affected her arms but not her legs, and that she had no lower body problems before the surgery. Dr. Katz noted that Donna did not have a left ankle reflex when Dr. Bicknell tested it or when he saw her, which meant to him that she had a sciatic nerve injury on that side. Dr. Katz also found weakness in various extensors in her left leg.

Dr. Katz thought there was no question that Donna had a sciatic nerve injury based on his physical examination. He thought it was more likely than not that her condition was not going to improve. He found a 13% impairment in her left leg, which related to a 5% loss of use of her body. She could do light and sedentary work and activities, but needed a break from standing or sitting for 10 minutes every hour. He testified as to the medical treatment and care that he thought she would need, as well as modifications to her home.

Dr. Katz thought that Dr. Bicknell's EMG had been done too early, which prevented Dr. Bicknell from seeing the changes that would occur. Dr.

Katz found no need to perform an EMG as part of his examination because the physical examination that he performed showed a sciatic nerve injury.

Dr. Randall Brewer is board-certified in anesthesiology, neurology, and pain medicine. His practice focuses on interventional pain medicine. He first treated Donna on September 22, 2009, and continued to treat her at the time of trial.

Dr. Brewer testified that fibromyalgia is a brain condition, not a muscle condition or a nerve condition, and it causes a heightened sense of pain. Fibromyalgia is a generalized pain problem that would be the same on the left and right and above and below the waist. He added that a sciatic nerve injury will aggravate the fibromyalgia, and vice versa. He also testified that it is not uncommon for a sciatic nerve patient to have the pain location move around. When he examined Donna on October 23, 2009, he found that on a straight leg test, she was positive for back and left leg pain at 30 degrees. Donna told Dr. Brewer on February 1, 2010, that she had returned to work in her office and it made her pain worse.

Dr. Brewer testified at length about his treatment of Donna's pain symptoms through 2015, including the use of epidural steroid injections and selective nerve blocks. He thought her sciatic nerve injury was permanent by 2013. Donna indicated to Dr. Brewer on March 17, 2014, that she was not getting as much relief from the injections, and that several weeks after receiving the injections, she felt like she did after the surgery. Donna told Dr. Brewer on May 13, 2014, that the pain from her nerve injury completely interfered with her general activities, normal work, and enjoyment of life.

Dr. Brewer described Donna as a stable chronic pain patient who was as good as she was going to get. He will continue seeing her every two to three months unless some intervening issue arises. He believed that it was more probable than not that Donna will need continued care and treatment for the rest of her life, that her sciatic nerve injury is permanent, and that the treatment that he has provided and will continue to provide is required by her sciatic nerve injury. He thought that the diagnosis of sciatic nerve injury in Donna's case was a clinical diagnosis based on the distribution of her pain being consistent with the distribution of that nerve. He reflected that it was common to see patients who cannot find a source of the pain through radiographic or electrodiagnostic means, and he thought that was what they were dealing with in Donna's case.

Dr. Terry Gardner, a family medicine physician, assumed Donna's care in February of 2006. She had been taking Lortab and Percocet, and was receiving Toradol injections. Dr. Gardner increased her dosages as her condition worsened. He continued to prescribe narcotic analgesics until Dr. Brewer took over her pain management.

Dr. Gardner described fibromyalgia symptoms as typically waxing and waning. Fibromyalgia involves the whole body, while sciatic pain has a different character. He thought that the symptoms Donna reported after the surgery were consistent with sciatic nerve pain.

When Dr. Gardner first saw Donna on February 27, 2006, she reported that she usually had to take something every day for fibromyalgia pain. She used Darvocet or Lortab from time to time, and had used Percocet from time to time. When he treated Donna a year later, he prescribed a

8

quantity of sixty Lortab 10mg and one hundred and twenty Ultracets, with five refills for each. Dr. Gardner agreed that Anglin occasionally experienced significant pain in her extremities prior to the surgery. When he treated her on June 30, 2009, she complained that she had been having fits with her fibromyalgia for the last several months. He refilled her Percocet 10mg prescription of seventy-five pills, but with no refills. He also refilled her Lortab 10mg prescription of one hundred and twenty pills, with five refills.

Dr. Steven Arkin testified on behalf of the Anglins as an expert in neurology. He prepared a report in 2019. He believed that her symptoms after surgery were consistent with a sciatic nerve injury. The sciatic nerve pain differed from her fibromyalgia because it never improved. Donna not only experienced pain, but there were a loss of a reflex, loss of muscle tissue, loss of muscle function, and changes in activity level. He added that continued tension on the sciatic nerve from the sacrospinous ligament would be consistent with a sciatic nerve injury.

Regarding Dr. Bicknell's EMG and nerve conduction studies, Dr. Arkin testified that a patient can have abnormal nerve conduction studies and a normal EMG and still have nerve damage. There was a lower amplitude on the nerve response in the peroneal and tibial nerves, and when both the peroneal and tibial nerve are involved, it has to be the sciatic nerve that is affected. Dr. Arkin also noted that the EMG showed decreased recruitment in the gastrocnemius, which is in the tibial branch of the sciatic nerve. He believed that a diagnosis of sciatic nerve injury was supported by the reduced recruitment and the decreased amplitudes of the peroneal and

9

tibial nerves as those results were consistent with sciatic neuropathy. What was being seen with the amplitudes in the peroneal and tibial nerves was what was expected to be seen in the evolution of sciatic neuropathy. Dr. Arkin felt there was no need to repeat the testing because of the evolution of symptoms, the persistence of symptoms, and the end result of atrophy of the muscles supporting the sciatic nerve.

Dr. Arkin testified that it was more probable than not that Donna had a sciatic nerve injury from the surgery. It was a stretch injury to the nerve, and a stretch injury that is persistent will lead to nerve degeneration and cause atrophy in the nerve distribution. Dr. Arkin believed that her loss of muscle tissue is permanent and that she is not going to recover.

Donna's daughter Allison Dryden testified that her mother was screaming in pain and grabbing her left leg following the surgery. Allison, who is a nurse, believed her mother's symptoms were consistent with a sciatic nerve injury. She described her mother as someone who once was full of life and looking for adventure, but is now someone who sits and cries a lot because of pain.

Donna's daughter Stacy Anglin is also a nurse. She testified that she called her father after the surgery and could hear her mother screaming in the background. She also believed that her mother's symptoms were consistent with a sciatic nerve injury. Stacy's impression was that her mother would not have had the surgery had she been given adequate information and been told that a sciatic nerve injury was a surgical risk.

Stacy described Donna as someone who was strong, loved life, and worked hard. Both daughters recounted times when Donna has fallen since

10

the surgery, and activities, such as gardening and jet skiing, that Donna can no longer do.

Dr. Robert Eisenstadt provided a 2021 report concerning economic losses. He testified that his report included the present value of the cost of the life care plan prepared by Dr. Jason Marchetti.

Robert Anglin has been married to Donna since August 22, 1986. He testified about the active lifestyle that they led before the surgery. They coached teams and played softball and basketball. Donna did most of the work to maintain the four acres of land that they lived on in Haynesville.

Robert testified that Donna had no mobility issues before the surgery. He recalled that she was screaming of left leg pain immediately after the surgery. Her pain now prevents her from doing activities, and she has to pick and choose when she can exert herself. While they once traveled frequently, she can now hardly walk after sitting in the car for an hour. He thought their lives had changed completely since the surgery. He felt that her pain has gotten progressively worse.

Donna Anglin testified that she had worked as an administrator for the Bienville Parish Family Clinic ("clinic"). She was able to work from home for six weeks following the surgery. She testified that it became harder for her to focus at work. She was placed on medical leave, and after the leave ended, the Board decided in January of 2012 that she could not return. She obtained a small payroll job, but eventually lost that job as well. She filed for Social Security disability in October of 2013 and was approved in 2014. She listed fibromyalgia, sciatic nerve damage, and a colon resection as her reasons for seeking disability.

11

Donna testified that she saw Dr. Cline for the first time on August 19, 2009. She recalled that he told her that the surgery was a routine procedure and would not affect her fibromyalgia. She maintained that Dr. Cline appeared irritated when she asked questions. He told her that he would use mesh but did not explain how, and he never mentioned a sacrospinous ligament suspension. He then told her to meet with the scheduling nurse to sign the necessary forms. When she met with the scheduling nurse was the first time that she saw the informed consent documents. The nurse did not go over all of the documents with her. Donna maintained that she would not have had the surgery if she had been told that it could impact her sciatic nerve.

Donna recalled feeling pain in her left leg and begging for pain relief when she regained consciousness in the recovery room. The pain continued after she returned home. She made an appointment to see Dr. Cline, but Dr. Spinazze came into the room and told her that Dr. Cline was unavailable. She asked him for a referral to determine what was wrong with her leg. Donna claimed that she later asked Dr. Cline for a referral and he told her to get one from Dr. Anglin.

Donna testified that she has experienced continuous and significant pain in her left leg since the surgery. Her pain has gradually worsened and it is harder for her to function. This pain was different from her fibromyalgia, which would come and go. She could recover from her fibromyalgia after a day of rest. She often spends time sitting on the couch and being depressed. She characterized her life as merely existing instead of living.

Donna loved jet skiing and considered that to be her release. After the surgery, she could no longer ride her jet ski like she once did, and she realized by 2015 that she could not ride it all. She would attempt to use a riding mower and then would have to stop. She walked five miles twice a day before the surgery, but can now walk only a short distance before having to stop. She forced herself to walk five miles in 2011 or 2012 to work through some psychological issues.

Donna testified that she can no longer lead a youth group and attend their one-week camps, which was something that she did for twenty years. It became too difficult for her to attend church services, and she would become embarrassed when asked what was wrong with her.

Donna testified that she complained to Dr. Rhonda Webb in July of 2005 that she had chronic muscle pain from fibromyalgia. A bone density scan done in September of 2005 showed that she had osteopenia, which is weakening of the bones. Dr. Anglin treated her for right buttock, right lateral thigh, and right anterior hip pain on September 29, 2005. His impression was right lateral femoral cutaneous nerve neuralgia. She also complained during that visit of aching all over from her fibromyalgia.

On March 22, 2006, Dr. Larry Broadwell did a rheumatology consultation because of her worsening fibromyalgia. She said that her fibromyalgia had progressed over the past several years, particularly along her thoracic spine. She described it as feeling like a severe sunburn and very sensitive to the touch. She reported that the most difficult thing for her to do was to function on a daily basis because of her fatigue and pain.

Donna testified that her fibromyalgia seemed to hurt more in her sternum, and that the pain radiated to her back between her shoulder blades.

Donna received treatment at her place of employment. On February 8, 2006, she complained to a Nurse Practitioner ("NP") at the clinic of aching all over due to fibromyalgia and received a Toradol injection. On July 13, 2006, she complained to the NP of throbbing pain all over. Thirteen days later, she complained to the NP of throbbing pain from her neck down and to her extremities.

She saw Dr. Gardner on August 29, 2006, because she was having fibromyalgia pain again and wanted to refill her medications.

On October 18, 2006, she saw a NP at the clinic for complaints of joint pain and throbbing from the neck, trunk, and down including her hands and fingers. She testified that the fibromyalgia made her muscles hurt intensely, and it sometimes made her joints hurt, but she would not characterize it as debilitating. She agreed that the pain that she experienced from fibromyalgia was significant enough for her to take large amounts of pain medication.

On March 23, 2007, she saw a NP at the clinic for complaints of pain all over from fibromyalgia. Three days later, she saw a physician at the clinic who prescribed Toradol and a muscle relaxer for fibromyalgia. On May 24, 2007, she reported to the NP that she had pain in her back and all over. On June 11, 2007, she told the NP that she had pain all over and was given a Toradol shot. Two days later, she again complained to the NP about pain all over and was given a Toradol shot. On June 21, 2007, she complained to the NP of pain all over and pain in her joints and muscles,

14

more than usual, and was given a Toradol shot. The NP also ordered five hundred doses of 7.5 mg of Percocet.

Donna agreed that she probably received sixteen Toradol injections in 2006, twenty-four Toradol injections in 2007, and eight Toradol injections through August of 2009. She testified that the Toradol would ease the hurting enough that she could work. The Toradol injections were normally given at the clinic.

After the Anglins rested, Dr. Eric Bicknell testified on behalf of the Fund as an expert in physical medicine and rehabilitation. He explained that Dr. Patwardhan asked his office to perform an EMG and a nerve conduction study of her legs. However, it is his policy not to perform fully diagnostic tests before twenty-one days have passed since the injury-occurring event, although he can perform a limited nerve conduction study after ten days. He told Dr. Patwardhan's office that he would prefer to wait the twenty-one days. Dr. Anglin then asked him if he would consider doing some limited preliminary studies after the ten-day mark to obtain whatever information that he could and then later perform the fully diagnostic test.

Dr. Bicknell testified that the nerve conduction study done on September 9 was a very limited evaluation to see if a nerve had been cut. The study showed that had not happened. The study did show reduced left peroneal and tibial CMAP amplitudes. He felt at that time that the changes on the nerve conduction study were possibly suggestive of some degree of left sciatic nerve neuropathy.

Dr. Bicknell explained that the preliminary test showed some reduction in amplitudes that might or might not be meaningful, but he could not make a definitive statement based on the preliminary test.

The more definitive, full electrodiagnostic evaluation was done on September 29, 2009. However, he testified that the EMG was normal and did not reveal any evidence of sciatic nerve injury, peroneal nerve injury, obturator nerve injury, femoral nerve injury, or evidence of lumbar or lumbosacral radiculopathy.

Dr. Bicknell then repeated the nerve conduction studies. The amplitudes were further reduced in size on the left leg compared to the earlier study. He testified that it would have been seen on the EMG if the reductions in amplitude were caused by a sciatic nerve injury.

Dr. Bicknell found swelling in Donna's left leg that was so significant that he immediately referred her for an ultrasound to rule out deep vein thrombosis. He believed that the swelling was responsible for the marked increase in the amplitude reductions. Dr. Bicknell testified that it became apparent to him that the reason for the reductions on the first test was very likely due to some edema that he did not notice. In his opinion, there was some edema present that caused the reduction in amplitudes at the first visit. Dr. Bicknell considered his nerve conduction studies to be nondiagnostic because of the degree of swelling. The EMG was not affected by the swelling.

Dr. Bicknell found an H-reflex abnormality on the left side on September 9 that was suggestive of some degree of left sciatic neuropathy. He could not repeat the test on September 29 because of the swelling.

Dr. Bicknell noted there was reduced motor unit recruitment in the left medial gastrocnemius in his report. While that condition could indicate an abnormality, he would not attach diagnostic significance to it unless it was additionally accompanied by other changes on the EMG. It could be due to pain inhibition or nerve injury, but itself was not diagnostic of disease.

In summary, Dr. Bicknell stated that in order for him to make a diagnosis from the nerve conduction studies, he would need to see changes on the EMG that were consistent with those results.

Dr. Bicknell noted that Donna had been placed in the dorsal lithotomy position during her surgery, and he knew that one of the potential risks of that position is there can be a stretch or pressure injury of the sciatic nerve at the hip. It can be an inconsequential irritation that can cause pain or it could be a more substantive injury that can injure the axonal fibers of the sciatic nerve.

Dr. Bicknell explained that neurapraxia is a compression of a nerve that causes localized damage to the myelin sheath, but not damage to the nerve fiber itself, and it would not show up in an EMG of the leg because the change is high in the pelvis. A focal demyelination lesion in the pelvis or hip region is a known risk for patients placed in the dorsal lithotomy position. However, it is a temporary condition that normally resolves after a couple of weeks to a few months. Dr. Bicknell acknowledged that neurapraxia could persist if the cause of it remains present, but he would not know what persistent compression in the pelvis would be causing it. He added that the nerve would begin healing once the patient is taken out of the dorsal lithotomy position.

Finally, Dr. Bicknell testified that he would have seen it on the EMG if there was anything that injured the sciatic nerve by causing damage to the axonal fibers during the surgery. There was no EMG evidence of an axonal injury.

Dr. Edward Anglin is an orthopedic surgeon and a first cousin of Robert Anglin. He saw Donna in the hospital three days after her surgery. Her examined her because of her left leg pain and found that she was neurologically intact. His opinion at that time was that she had a sciatic nerve irritation of some kind. He did not think there was any nerve damage because there was no sensory deficit, reflex abnormality, or muscle abnormality. He gave her a Celestone injection and referred her to Dr. Bicknell. Dr. Anglin testified that he would defer to Dr. Bicknell on the issue of the existence of a serious injury to her left leg in the form of her sciatic nerve.

 Dr. Timothy Hart testified as an expert in obstetrics and gynecology. He thought that it was obvious that informed consent was not obtained for the procedure. He estimated that 90% of patients will complain in the recovery room of buttocks pain if the doctor uses the sacrospinous ligament to support the vaginal vault.

Dr. Hart did not think the sciatic nerve was injured by a suture because it is very hard to get to the spot where the sciatic nerve is in relationship to the sacrospinous ligament. Dr. Hart's affidavit was accepted into evidence. He opined that Dr. Cline did not cause by his action or inaction any damages to Donna in excess of $100,000.

Dr. Kevin Cline was the last witness. He testified that surgery had already been decided for Donna before he saw her based on the preoperative studies. There was an informed consent form for the prolapse portion and there was one for the incontinence portion because they were two separate procedures. He acknowledged that the consent form for the prolapse procedure mentioned nothing about sacrospinous ligament suspension or a Pinnacle mesh repair kit. He denied refusing to refer Donna to another doctor.

Dr. Cline testified that complications to extremities from the surgery are overwhelmingly from positioning. He recognized that traction of the suture on the sacrospinous ligament with the tension transmitted to the sciatic nerve was a risk. He explained that the doctor does not have direct sight of the suture, so it is done more by feeling. While he agreed that a person with fibromyalgia has a heightened response to pain or injury, he did not think that Donna's fibromyalgia should have prevented her from having the surgery.

## DISCUSSION

### *Dr. Marchetti's deposition*

The Anglins argue that the trial court erred in not allowing Dr. Marchetti's discovery expert deposition to be read into the record at trial. They argue that allowing a jury to read a deposition and examine attachments during deliberations was not an acceptable presentation of Dr. Marchetti's testimony and requiring it amounted to reversible error.

The Anglins maintain that the trial court would not allow a designated person to read Dr. Marchetti's deposition into the record. They do not cite

19

where in this 25-volume record that the trial court made this ruling. Presumably, it occurred at a teleconference prior to the hearing conducted on June 24, 2024. During that conference, the trial court denied the request to have two experts for the Anglins testify by zoom. At the hearing, plaintiffs' counsel stated: "and at the same time, I think, Judge, you decide - - you denied my right to use the - - you denied the use of my expert video - - expert discovery deposition being read into the record at trial." At the hearing, the trial court denied the request to use a discovery deposition for trial purposes. Plaintiffs' counsel stated that she would not take a writ if she could have the expert discovery depositions read into the record.

On June 27, 2024, the trial court rendered judgments denying the Anglins' motion to present remote live testimony by Dr. Marchetti, denying their motion to conduct Dr. Marchetti's video trial deposition for presentation at trial, and denying their motion to offer Dr. Marchetti's expert discovery deposition.

On July 3, 2024, this court granted the Anglins' writ application concerning the trial court's denial of their motion to offer Dr. Marchetti's deposition at trial. The order stated:

> Applicants Donna Anglin and Robert B. Anglin seeks supervisory review of the trial court's "Judgment on Plaintiffs' Motion to Offer Expert Discovery Depositions Pursuant to Louisiana Code of Civil Procedure Article 1450 A (5), Motion for Reconsideration and Request for Expedited Hearing." In this matter, counsel for applicants timely notified opposing counsel of their intent to offer the September 14, 2021, deposition testimony of Dr. Jason Marchetti at trial of this matter in accordance with provision K of the Scheduling Order. Considering the importance of Dr. Marchetti's testimony to this case, as well as his unavailability for trial, we find that the trial court abused its discretion in denying applicant's motion to present the testimony of Dr. Marchetti at trial via his expert discovery deposition. The writ is granted and the ruling of the

20

trial court as it relates to this issue is reversed. The matter is remanded for further proceedings and for compliance with provision K of the Scheduling Order prior to trial.

The Anglins maintain that the trial court directly disobeyed instructions from this court in response to the writ taken by them requesting that the trial court allow Dr. Marchetti's deposition to be read into evidence at trial. However, that was not what the writ grant stated. Moreover, the relief requested from this court concerned the denial of the request to use Dr. Marchetti's expert witness discovery deposition at trial, not specifically that it be read into the record at trial.

A trial court is granted broad discretion in conducting a trial and in determining whether to receive or refuse testimony. *Turner v. Stassi*, 33,022 (La. App. 2 Cir. 5/10/00), 759 So. 2d 299.

We discern no abuse of the trial court's discretion in denying the request for Dr. Marchetti's deposition to be read into the record at trial. This assignment of error is without merit.

Although it does not affect the outcome of this appeal, we note that neither Dr. Marchetti's deposition nor his lifecare plan is included with the exhibits on appeal. At the conclusion of her case on July 12, the trial court noted that plaintiffs' counsel had offered the Marchetti deposition, but it had not been entered into evidence. Dr. Marchetti's curriculum vitae was exhibit 20. The Anglins then rested. They offered the deposition and the trial court stated that it would deal with it shortly. At the beginning of trial on July 13, the deposition was admitted as exhibit 20.

The plaintiffs' attorney seems to indicate that she is aware of its absence from the record on appeal, as she wrote in her brief, "there were no

depositions redacted to the extent the deposition could be given to the jury to take to the deliberation room."

### *Settlement*

The Anglins argue that the trial court erred in allowing evidence and testimony about the Boston Scientific settlement. They contend that the issue at the heart of the Boston Scientific lawsuit, the migration of the mesh product, had nothing to do with the stretching of the sciatic nerve that was the subject of the instant lawsuit.

On August 19, 2021, the Anglins filed a motion in limine to prohibit the Fund from referring to the Boston Scientific claim or settlement. On April 1, 2024, the Anglins filed an amended motion to prohibit reference to their product liability claim. They argued that the damages awarded in the settlement were related to complications caused by the mesh itself, and no payments were directly related to the nerve damage sustained by Donna.

At a hearing held on April 22, 2024, the trial court denied the motion in limine concerning the Boston Scientific lawsuit. The court told the Fund that it would be allowed to refer to the lawsuit itself and the settlement documents, but it could not refer to the settlement amount. A judgment in accordance with the ruling was rendered on May 15, 2024.

On June 28, 2024, this court denied a writ concerning the trial court's denial of the motion in limine because the exercise of supervisory jurisdiction was not warranted.

A district court is afforded great discretion concerning the admission of evidence at trial, and its decision to admit or exclude evidence may not be reversed on appeal absent an abuse of that discretion. *ETC Texas Pipeline,*

22

*Ltd. v. Louisiana Energy Gateway, LLC*, 56,493 (La. App. 2 Cir. 10/1/25), 422 So. 3d 832.

The Anglins sought recovery for many of the same damages in the Boston Scientific lawsuit as they are seeking in the current lawsuit. Evidence concerning the lawsuit and settlement was relevant and properly admitted. There was no abuse of the trial court's great discretion. The assignment of error is meritless.

***Settlement amount***

The Anglins argue that the Fund violated the court's order when the settlement documents in the jury binder included the settlement amount of $77,000. They maintain that this caused or contributed to the jury's verdict. Again, the Anglins do not cite at what point of the trial this occurred.

From our careful review of this record, we note that at the conclusion of the third day of trial on July 11, 2024, the Fund's counsel told the court that his paralegal had reminded him that the settlement agreement was included in the exhibits and was in the exhibit binder. The trial court instructed him to remove them from the binder before court by the next morning.

On July 13, 2004, at the conclusion of the presentation of evidence, the Fund's counsel responded in the affirmative when asked by the court if he had redacted the settlement amount from the jury binder. The Anglins' counsel then said she wanted to be sure the page and the amount were removed from the jury binder, and the trial court said they had.

There is no evidence that any juror saw the amount before it was removed. The binder contained evidence under six tabs, including six

hundred pages of medical records under the last tab. The settlement document itself was twenty-five pages. It is unlikely a juror would happen upon the page showing the settlement amount.

Furthermore, the Anglins have not directed this court to any admonishment or relief that they sought from the trial court when the mistake was discovered. Reversal of a jury's verdict is not warranted unless the trial court's error, when compared to the record in its entirety, was so substantial as to materially affect the outcome of the case; the complainant has the burden of proof. *Gray v. Strong*, 56,512 (La. App. 2 Cir. 10/1/25), 422 So. 3d 395.

Even if an error occurred, it was harmless. The jury heard ample testimony concerning Donna's medical history, including how her fibromyalgia affected her before the surgery. This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, the judgment is affirmed at the Anglins' costs.

**AFFIRMED**.

24